**JUNG SAM et al. v. HAFF, District Director of Immigration and Naturalization.**

**No. 9500.**

Circuit Court of Appeals, Ninth Circuit.

Dec. 18, 1940.

Dion R. Holm, of San Francisco, Cal., for appellants.

Frank J. Hennessy, U. S. Atty., and Robert B. McMillan and L. R. Mercado, Asst. U. S. Attys., all of San Francisco, Cal. (Arthur J. Phelan, of San Francisco, Cal.,

of U. S. Immigration and Naturalization Service, on the brief), for appellee.

Before WILBUR, GARRECHT, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

May 11, 1939, one Jung So, a person of the Chinese race, arrived at the Port of San Francisco aboard the steamship "President Taft," accompanied by two youths for whom he sought admission into the United States. These two boys, appellants here, Jung Tim and Jung Sam, aged, at the time of arrival, 15 years 6 months and 10 years 8 months, respectively, were allegedly the foreign-born sons of said Jung So, who was the son of a native-born citizen of the United States, and admission was sought on that ground.

Hearings were held by the Board of Special Inquiry to determine the status and admissibility of the applicants. As a result of these hearings, it was conceded that the alleged father was a citizen; that he resided in the United States prior to the birth of either applicant; that by reason of journeys to China, Jung So was in China at a time to render possible the paternity of children of the ages claimed; and that Jung So had, on previous occasions, advised the immigration authorities he claimed parentage of children in China of the names and ages to correspond with those given by the applicants. Jung So had one son, Jung Yow, admitted to the United States October 31, 1928.

After concluding the hearings, the Board of Special Inquiry recommended the applicants be denied admission to the United States. Appeal was taken to the Board of Review, which ordered dismissal. Thereafter, on the basis of receipt of additional evidence from China—a group photograph forwarded to Jung So by his alleged wife—another hearing was had before the Board of Special Inquiry which, at the conclusion thereof, adhered to its former decision. Another appeal was taken to the Board of Review, attended with the same result. Later, request was made to sustain the appeal of Jung Tim, the elder applicant, upon the basis that he was included in the group photograph, while Jung Sam did not appear therein. This was denied. The alleged father filed a petition for writ of habeas corpus in behalf of the applicants in the court below. The petition for the writ was denied and an appeal was taken to this court.

The appellants contend that the testimony sustains the burden of proof imposed upon them of establishing their relationship with the alleged father; that the discrepancies in the testimony are trivial and neither prove or disprove the relationship; and that the immigration officials failed to give any weight to the group photograph.

All three witnesses—the two applicants and the alleged father—were in substantial accord on the basic outlines of the story, but a number of discrepancies in the testimony of the three were considered by the Board of Special Inquiry to be of a sufficiently serious nature to discredit the witnesses and justify exclusion.

The first of these inconsistencies concerns the attendance of the applicants at school. The alleged father testified, before the Board of Special Inquiry, that he arrived home in the middle of the week, at about 4 p. m.; that his wife and three sons, Tim, Sam, and Quan, were at home to greet him; that neither boy attended school at any time —not even for a single day—while he was last in China, a period of nearly a year. Jung Tim, the elder applicant, testified that Jung So arrived at home a little after 9 a. m., on a Sunday; that Jung Sam was also at home; that both boys attended the same school; that the school hours were from 6 or 7 to 10 in the morning, with an hour off for breakfast, for which they came home, and then back to school at 11 a. m., until dismissal at 4 p. m.; that "20 odd" pupils attended the school; that both boys attended the school for several months after the father's return home (from March to October) until school was discontinued because of Japanese bombings in the neighborhood. Jung Sam said he was not at home when his father arrived, but first saw him when he came home from school at noon; that Tim was also at school that day, but arrived home earlier than he; that "50 odd" pupils attended the school. Both boys agreed as to the time of, and reason for, discontinuance of school, disagreed on the number of pupils and on the question of who was at home when the father arrived. The alleged father disagreed with the boys regarding the time of arrival and very markedly on their attendance at school, he saying they did not attend school at all after his arrival and they that they were in attendance for the greater part of the day for several months after Jung So's arrival in the village.

Another difficulty arises in attempting to reconcile testimony of the three witnesses respecting visits to Hong Kong made from the home village. Jung Tim testified he had made two trips to Hong Kong, once for two or three days a few months before commencing the journey to the United States, and the second time as a part of that journey. Jung Tim said one Young Ing accompanied him on the first trip and that he stayed at Young Ing's house. Jung Sam said Tim had been to Hong Kong but once to his knowledge and that time was on the trip to the United States; that he did not recollect the first trip to Hong Kong, to which Tim testified; that Tim was absent from home a few nights, which absence Sam thought was occasioned by fear of Japanese airplanes. The alleged father, on the other hand, said Jung Tim had been to Hong Kong three times to his knowledge, once with Young Ing for seven or eight days, once for a little over a month, and the last time on the way to the United States. Moreover, while both Jung So and Jung Tim claimed to know Young Ing and said that the latter had visited at their home, Jung Sam denied knowing such person.

Considerable confusion is caused by the testimony relative to the leave-taking of the alleged mother and the village of Sar Yuen and the trip to and stay in Hong Kong immediately preceding embarkation. Jung Tim testified they said good-bye to the mother and younger brother at the bus depot in Shek Kee City (about twenty-five minutes walk from Sar Yuen village), but both Sam and Jung So said the good-byes were taken at home and that neither the mother nor youngest child accompanied them to Shek Kee City. Jung So said that he accompanied the boys from Sar Yuen village to Shek Kee City and that a friend of his walked with them, as well as several friends of Jung Tim's; he also said that Wong Kee, a "fellow villager," originally "from my village" came to Sar Yuen village to meet the boys. Tim said the mother and younger brother and "no others" accompanied the three travelers from their home village on the walk to Shek Kee City. According to Sam's testimony, only the three of them walked to Shek Kee City. Both Jung So and Jung Sam said they hired one coolie porter to carry the luggage to Shek Kee City, but Tim said there were two porters. Both boys testified that they and their alleged father traveled together from Shek Kee City to Hong Kong, while Jung So, the alleged father, said he left the boys in the care of Wong Kee, who accompanied the two boys to Hong Kong and that he, Jung So, returned home and did not leave for Hong Kong for another six or seven days. The boys maintained that the alleged father and not Wong Kee accompanied them to Hong Kong and that they did not know the said Wong Kee. Jung So, on the other hand, said Wong Kee was not his friend, but Tim's!

Another unexplained difficulty occurs in the different versions describing their hotel accommodations while together in Hong Kong for seven or eight days just prior to embarkation. Jung So testified that they had two rooms, he one on the third floor of the hotel at the rear, and the two boys a room on the same floor at the front. The boys said they had one room, in which all three slept in one bed, Tim placing this room on the third floor and Sam on the second.

Questioned relative to the whereabouts of his eldest son, who had previously been admitted to the United States, Jung So said he had not seen Jung Yow for two or three years, did not know where he was, and then, when the examining officer insisted Jung Yow was in San Francisco, the witness admitted he knew that, but added that he had not seen him. Jung Tim said that he had seen Jung Yow on the dock in San Francisco after arrival and that the latter was then with Jung So, and that Jung So told him they were brothers. Jung Sam testified to the same effect, saying Jung So pointed out Jung Yow to him.

The group photograph, mentioned above, was also the subject of testimony which created another conflict. This photograph purported to include Jung Tim, the alleged mother, Jung Quan, Jung So, and a neighbor boy. Each of the three witnesses assigned the same names to each of the figures in the photograph and, strangely enough, both Tim and Sam remembered that the neighbor boy was Wong Kee (whom each theretofore said he did not know!). There is no mistaking Jung So in the photograph, by reason of the peculiar texture of his skin, but the photograph does not purport to be a family group, for Jung Sam is not included and one who is included is assertedly not a relative. All testified that Sam was ill the day the photograph was taken.

The applicants were accorded the privilege of fully presenting their claims to the

Board of Inquiry and availed themselves of that privilege. Considerable evidence was brought out on the hearings, much of which tended to establish the appellant's claims, but in the presentation of this evidence the discrepancies were developed. In addition to the discrepancies or conflicts heretofore set forth, confusion also existed in the testimony: whether the alleged father did or did not bring home certain gifts on his arrival at the village from the United States; whether there were fish in the pond in the village; and whether the boys slept in a regular bed when at home, or on planks resting upon "horses."

■ It is established by a large number of decisions that "the findings of the immigration officers on questions of fact affecting the right of an alien to enter this country are conclusive against any inquiry by the courts." Fong Quong Hay v. Nagle, 9 Cir., 17 F.2d 231, 232. Just as firmly fixed is the rule, in cases of this character, that before this court on review can overturn the determination of immigration authorities it must appear that the evidence submitted on the application for admission so conclusively established the fact in issue that the order of exclusion must be held arbitrary or capricious. Mui Sam Hun v. United States, 9 Cir., 78 F.2d 612, 615. Denial of fair hearing is not established merely by proving the decision of the immigration officers was wrong. United States ex rel. Tisi v. Tod, 264 U.S. 131, 133, 44 S.Ct. 260, 68 L.Ed. 590; Kishan Singh v. Carr, 9 Cir., 88 F.2d 672, 679. It is of no consequence that this court may have found differently than the immigration officers upon the evidence adduced, for it is not our function to weigh the evidence, but to consider whether or not the applicant was accorded a fair hearing. Mui Sam Hun v. United States, supra; Ong Guey Foon v. Blee, 9 Cir., 112 F.2d 678, 689; Dong Ah Lon v. Proctor, 9 Cir., 110 F.2d 808, 809, 810.

■ Since the discrepancies upon which the Board based its order of exclusion do not concern the precise point of relationship of the applicants to the alleged father, a citizen of the United States, the appellants urge that these are so wholly immaterial and inconsequential as to render the decision of the administrative authorities arbitrary or capricious and the hearing unfair. But the courts have consistently recognized the right of administrative officers to inquire into collateral matters for the purpose of testing credibility. Louie Lung Gooey v. Nagle, 9 Cir., 49 F.2d 1016; Nagle v. Dong Ming, 9 Cir., 26 F.2d 438, 439; Siu Say v. Nagle, 9 Cir., 295 F. 676; Jeung Bock Hong et al. v. White, etc., 9 Cir., 258 F. 23, 24.

■ It would seem that a normal boy or young man of the age of either appellant must certainly retain a very vivid impression of leaving his home and mother on the greatest adventure of his life, on his first long journey. Such a youth would hardly forget, or be mistaken, about the first incidents of such a journey and particularly as to persons who began it with him. Again, the sight of a brother on the pier upon arrival in a strange land—the one relation on the entire continent—should have indelibly impressed itself upon his mind. Yet, on these important details there is not accord. Furthermore, these incidents occurred so shortly before the examination as to make the presumption of any failure of memory inconceivable. In the face of these facts we can not say the action of the Board was arbitrary or capricious, or amounted to a denial of a fair hearing. Wong Sun Ying v. Weedin, 9 Cir., 50 F.2d 377, 378. Moreover, persons living in the same household as father and sons for several months should know whether or not the sons attended school. Cf. Woon Sun Seung v. Proctor, 9 Cir., 99 F.2d 285, 287.

The order of the court below is affirmed.